UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIOFRONTERA AG,

               Plaintiff,

       -versus-

DEUTSCHE BALATON AG, DELPHI
UNTERNEHMENSBERATUNG AG, VV
BETEILIGUNGEN AG, ABC
BETEILIGUNGEN AG, DEUTSCHE
BALATON BIOTECH AG, and WILHELM
KONRAD THOMAS ZOURS,

               Defendants.

18 Civ. 5237 (LAP)

**ORDER**

LORETTA A. PRESKA, Senior United States District Judge:

In this case, Plaintiff Biofrontera AG ("Biofrontera") alleges that Defendants Deutsche Balaton AG ("Deutsche Balaton"), Delphi Unternehmensberatung AG ("Delphi"), VV Beteiligungen AG ("VVB"), Deutsche Balaton Biotech AG ("DB Biotech"), and Wilhelm Konrad Thomas Zours ("Mr. Zours") misled Biofrontera investors to facilitate tender offers Defendants launched for Biofrontera stock. (See Amended Complaint, dated July 8, 2019 ("Complaint" or "AC") [dkt. no. 41].) Biofrontera asserts claims for primary and secondary violations of the tender offer provisions in Sections 13(d) and 14(e) of the Exchange Act of 1934 ("Exchange Act") and SEC Rule 14e-5, alongside common law claims for libel, trade libel, and tortious interference with prospective business opportunity. (AC ¶¶ 58-90.) Defendants collectively have moved to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(6) and 9(b). (Notice of Motion to Dismiss Amended

1

Complaint, dated Aug. 19, 2019 [dkt. no. 48].)  As set forth below, Defendants' motion is <u>GRANTED</u> as to Biofrontera's § 14(e), Rule 14e-5, and § 20(a) claims and is otherwise <u>DENIED</u>.  Biofrontera may take jurisdictional discovery, and the parties are directed to submit supplemental briefing on the common law claims' sufficiency under German law.

## I.   BACKGROUND

Biofrontera is a German pharmaceutical company headquartered in Germany.  (AC ¶ 22.)  Biofrontera's ordinary shares trade on a German stock exchange, and its American Depository Shares ("ADSs") -- each of which represents two ordinary shares in Biofrontera -- trade on the NASDAQ Capital Market ("NASDAQ") and are registered with the Securities and Exchange Commission.  (AC ¶¶ 3, 22; Declaration of Rolf Birkert, dated Aug. 19, 2019 ("Birkert Decl.")[dkt. No. 51] ¶ 13.)  Defendants are a collection of related entities, all based in Germany, and their beneficial owner, Mr. Zours, a German citizen.  (AC ¶¶ 2, 22-23; Declaration of Mr. Zours, dated Aug. 19, 2019 ("Zours Decl.") [dkt. No. 50] ¶ 1.)  Biofrontera alleges that Mr. Zours and Deutsche Balaton have long been interested in investing in Biofrontera and have repeatedly attempted to gain control of Biofrontera without obtaining a controlling stake in the company.  (AC ¶ 25.)

On February 14, 2018, after an initial public offering ("IPO"), Biofrontera's ADSs first started trading on NASDAQ.  (<u>Id.</u> ¶¶ 3-4, 26-28.)  Biofrontera alleges that in early February, while

Biofrontera was running a U.S. roadshow to generate interest in the IPO, Mr. Zours and Deutsche Balaton published a letter on Deutsche Balaton's website making false statements about the legality of the IPO's pricing and the accuracy of remarks Biofrontera officers made about a corporate loan and a research partnership with an entity named Maruho. (Id. ¶ 27.) In May 2018, months after the IPO closed, Mr. Zours again made false statements in a letter published on Deutsche Balaton's website about some Biofrontera officers and the legality of Biofrontera's U.S. "bookbuilding process." (Id. ¶¶ 29-30.) Biofrontera alleges that Defendants published these false statements to derail the company's U.S. ADR roadshow and to depress Biofrontera's share price so Defendants could effectuate a tender offer at artificially low prices. (Id. ¶¶ 4, 27, 53.)

On March 16, 2018, Deutsche Balaton announced a tender offer for Biofrontera shares. (Id. ¶ 5.) The purpose of this offer was to exceed the "blocking" minority threshold of 25% of Biofrontera's shares. (Id.) German regulators did not allow the offer to move forward, however, as it failed to comply with German law. (Id.)

Later, on May 28, 2018, Deutsche Balaton directed DB Biotech to announce a separate tender offer for 6,250,000 Biofrontera shares (the "2018 Tender Offer"). (AC ¶¶ 9, 37.) The tender offer documents made clear that the offer was proceeding under German law and that DB Biotech was only soliciting ordinary shares of Biofrontera traded on the German exchange, not its ADSs:

> The subject matter of the Offer is the acquisition of
> up to 6,2500,000 no-par-value registered shares of
> Biofrontera AG . . . The securities that are related
> to the Biofrontera Shares but are traded on any stock
> exchanges other than German stock exchanges, as well
> as the American depository shares with the ISIN
> US09075G1058, which are also traded on the Stuttgart
> stock exchange, are expressly not a subject matter of
> this Acquisition Offer.

(Declaration of Jeffery J. Chapman, dated Oct. 4, 2019 ("Chapman Decl.") [dkt. no. 56], Ex. 1 at 4; see also Chapman Decl. Ex. 2 at 3).)   Defendants, however, took no measures to prevent U.S. investors from taking part in the tender offer and actively solicited at least one investor located in the United States -- a fund manager employed by an institutional investor based in New York -- to encourage the investor to participate in the tender offer. (AC ¶¶ 9, 12, 13, 38, 42.)   To take part in the offer, Biofrontera ADS holders needed to exchange their ADSs for ordinary shares and then tender the shares to DB Biotech.   (See id. ¶¶ 9, 11, 13.)

On June 11, 2018, Defendants filed a beneficial ownership report with the SEC on Schedule 13D.   (Id. ¶ 35.)   Exchange Act §§ 13(d)(1) and 13(d)(6)(B) require investors to file a Schedule 13D report with the SEC within a specified time period after their ownership stake in a registered company surpasses certain levels. (Id. ¶¶ 31-33.)   The Schedule 13D report covers information including, among other things, the source of the funds used to purchase the securities and whether the purchaser intends to acquire control of the corporation.   (Id. ¶ 33.)   Biofrontera alleges that although Defendants previously held sufficient shares

to trigger the Schedule 13D reporting requirement, they did not make their filing until June 11, 2018 -- approximately a month after their deadline to do so had expired. (Id. ¶¶ 35, 36.) Moreover, the Schedule 13D report and initial amendments failed to disclose that Defendants were targeting U.S. investors and buying Biofrontera ADSs in connection with the tender offer. (Id. ¶ 36.)

On May 29, 2019, DB Biotech and Delphi announced an additional tender offer for Biofrontera shares (the "2019 Tender Offer"). (Id. ¶¶ 16, 36.) Like the prior offer, the 2019 Tender Offer solicited ordinary shares of Biofrontera, not ADSs:

> This bid solely refers to Biofrontera Shares. Other securities which refer to Biofrontera Shares are explicitly not part of this purchase bid. In particular, the bid does not refer to American Depository Shares with ISIN US09075G1058 which represent Biofrontera Shares ("Biofrontera-ADS") and which are also traded at the Stuttgart stock exchange. Owners of Biofrontera-ADS may not submit them for sale as part of this bid. Owners of Biofrontera-ADS who are looking to accept the bid regarding the underlying Biofrontera Shares must first exchange their Biofrontera-ADS into Biofrontera Shares. Subsequently, these Biofrontera Shares can be submitted for sale in the context of this bid.

(Declaration of Marsha J. Indych, dated Aug. 19, 2019 ("Indych Decl.") [dkt. no. 52], Ex. E at 4.) Defendants filed an amended Schedule 13D Report addressing the 2019 Tender Offer on June 7, 2019, which stated that the "offer will relate to Ordinary Shares only; ADS will not be able to be tendered" and that "[n]o tender offer materials will be distributed, nor will any disclosure of the

tender offer be made by [DB Biotech] or its agents or affiliates, in the United States." (AC ¶¶ 45, 55; Chapman Decl. Ex. 7 at 14.)

Contrary to their public representations about not targeting U.S. investors, Defendants were in fact actively pressuring U.S.-based Biofrontera stockholders to sell them their shares. (See AC ¶¶ 16, 36, 55.) Defendants half-acknowledged their solicitation efforts on June 13, 2019, when they filed an amended Schedule 13D report disclosing that they "expected" to extend the 2019 Tender Offer to U.S. holders of Biofrontera shares under SEC Rule 14d-1(c)'s "Tier I" exemption, which frees certain tender offers for shares in foreign companies from complying with the U.S. tender offer rules. (Id. ¶ 45; see also 17 C.F.R. § 240.14d-1(c).) Then on June 25, 2019, in a follow-on amendment to their Schedule 13D report, Defendants disclosed that the 2019 Tender Offer was in fact "being made" to U.S. investors under the Rule 14d-1(c) exemption. (Id. ¶ 45.) Biofrontera alleges that these belated disclosures did not cure Defendants' prior failure to disclose that they were soliciting U.S. investors and that Defendants' claimed reliance on the Rule 14d-1(c) exemption was inaccurate, as Defendants had failed timely to file regulatory paperwork needed to take advantage of the Tier I exemption. (Id. ¶¶ 46-49.)

## II.  **LEGAL STANDARD**

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." DiStefano v.

Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001) (per curiam) (citation omitted).  To withstand dismissal, "plaintiff must make a prima facie showing that jurisdiction exists," Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006), i.e., "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010) (citation and internal brackets omitted).  "Where a court does not hold an evidentiary hearing on the jurisdictional question, it may, nevertheless, consider matters outside the pleadings." Camacho v. Vanderbilt Univ., No. 18 Civ. 10694 (KPF), 2019 WL 6528974, at *2 (S.D.N.Y. Dec. 4, 2019) (citing Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 86 (2d Cir. 2013)).

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993)(citation omitted).  To survive dismissal, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556).  Put differently, the factual

allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (citation and internal quotation marks omitted).

When deciding a Rule 12(b)(6) motion, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." Silsby v. Icahn, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), aff'd sub nom. Lucas v. Icahn, 616 Fed. Appx. 448 (2d Cir. 2015) (summary order). "The Court can take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" Id. (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991)).

## III. DISCUSSION

### a. Rule 12(b)(2) Motion

The Court will first address Defendants' motion to dismiss for lack of personal jurisdiction. For a court to exercise personal jurisdiction, three main requirements must be met. First, "service of process . . . must have been procedurally proper." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59 (2d Cir. 2012). Next, "there must be a statutory basis for personal jurisdiction that renders such service of process effective." Id.

Lastly, "the exercise of personal jurisdiction must comport with constitutional due process principles." Id. at 60.

As to the first and second requirements, Defendants neither challenge service of process nor dispute that Exchange Act § 27, 15 U.S.C. § 78aa, provides a statutory basis for personal jurisdiction in this case. (See Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint, dated Aug. 19, 2019 ("Def. Br.") [dkt. no. 49] at 1-6); see also Das v. Rio Tinto PLC, 332 F. Supp. 3d 786, 799 ("The Exchange Act 'permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment.'" (quoting SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990)). Defendants' Rule 12(b)(2) motion instead attacks under the third prong of the jurisdictional framework, arguing that the Court's exercise of personal jurisdiction over them would violate due process requirements.

There are two parts to analyzing whether asserting personal jurisdiction comports with due process: (1) the "minimum contacts" test and (2) the "reasonableness" test. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996). The "minimum contacts" test considers "whether the defendant has certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002) (citation and internal quotation marks omitted). The "reasonableness" test

examines "'whether it is reasonable under the circumstances of the particular case' to assert personal jurisdiction." In re Parmalat Sec. Litig., 376 F. Supp. 2d 449, 453 (S.D.N.Y. 2005) (quoting Bank Brussels, 305 F.3d at 129). Defendants argue that Biofrontera fails under both tests. The Court will analyze each in turn.

**Minimum Contacts.** Due process jurisprudence distinguishes between two types of personal jurisdiction: general and specific. See Daimler AG v. Bauman, 571 U.S. 117, 126-29 (2014). General jurisdiction permits courts to adjudicate all claims against defendants whose ties to the forum "are so 'continuous and systematic' as to render them essentially at home in the forum State." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 317 (1945)). Specific jurisdiction, by contrast, "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." Goodyear, 564 U.S. at 919 (internal quotation marks omitted). For a court to assert specific jurisdiction over the defendant, "the suit must aris[e] out of or relat[e] to the defendant's contacts with the forum." Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S.Ct. 1773, 1780 (2017) (emphasis in original; citation and internal quotation marks omitted).

Biofrontera does not contend that Defendants are subject to general jurisdiction here. (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint,

dated Oct. 4, 2019 ("Opp.") [dkt. no. 55] at 10.)   Rather,
Biofrontera argues for the exercise of specific jurisdiction based
primarily on the following contacts: (1) Defendants signed off on
Schedule 13D reports filed with the SEC containing inaccurate
information about the tender offers; (2) Defendants contacted a New
York fund manager in 2018 and 2019 to try to persuade it to sell
the fund's Biofrontera shares to Defendants; (3) Deutsche Balaton
and Mr. Zours published two misleading letters on a German
website -- one of which was written in English and addressed to a
Biofrontera board member located in New York -- that were intended to
reach U.S. investors and interfere with the IPO and trading of
Biofrontera's ADSs; and (4) U.S. investors were able to participate
in the tender offers by converting their ADSs into ordinary shares
and tendering those.   (See, e.g., AC ¶¶ 26-30, 35, 38, 42, 45-49,
57; Declaration of Thomas Schaffer, dated Sept. 23, 2019 [dkt. no.
57] ¶¶ 2-8; Declaration of Michael Schwartzkopff, dated Sept. 27,
2019 ("Schwartzkopff Decl.") [dkt. no. 58] ¶¶ 3-7.)

     For their part, Defendants contend that Deutsche Balaton's
Schedule 13D is insufficient to confer personal jurisdiction and
that their tender offer materials limited the offers to ordinary
shares traded on the German stock exchange, not ADSs traded on the
NASDAQ. (See Reply Memorandum of Law, dated Nov. 8, 2019 ("Reply")
[dkt. no. 60] at 1-2; Birkert Decl. ¶¶ 15-22, 24-27, 30.)   As to
the allegedly defamatory letters, Defendants argue that there is no
evidence that Defendants directed those documents -- which were

published on a German website -- at U.S. investors.  (Reply at 3.)
They further contend that Biofrontera's claim about Defendants'
soliciting investments in the United States is vague and based on
hearsay that cannot be considered on a Rule 12(b)(2) motion.  (Id.
at 3-4.)  Defendants also submitted their own declaration attesting
that that they did not target U.S. investors and are unaware of
U.S. investors tendering their shares to them.  (Reply at 4; Zours
Decl. ¶¶ 14-18; Birkert Decl. ¶¶ 32-35.)

Given the disputed factual record, the Court is not now in a
position to decide whether subjecting Defendants to jurisdiction
would satisfy due process.  "In evaluating jurisdictional motions,
district courts enjoy broad discretion in deciding whether to order
discovery."  In re Terrorist Attacks on September 11, 2001, 349 F.
Supp. 2d 765, 811 (2d Cir. 2005).  "A district court retains
considerable latitude in devising the procedures it will follow to
ferret out the facts pertinent to jurisdiction."  APWU v. Potter,
343 F.3d 619, 627 (2d Cir. 2003) (citation and quotation marks
omitted).  "If a plaintiff has identified a genuine issue of
jurisdictional fact, jurisdiction[al] discovery is appropriate even
in the absence of a prima facie showing as to the existence of
jurisdiction."  Daventree Ltd. v. Republic of Azerbaijan, 349 F.
Supp. 2d 736, 761 (S.D.N.Y. 2004).  Here, there are open factual
questions regarding Defendants' efforts to solicit U.S. investors
in connection with the tender offers and whether Defendants
directed the letters posted on Deutsche Balaton's website at U.S.

investors.  Discovery is needed on those issues in order for the Court sensibly to evaluate Defendants' contacts with the forum.[1]

**Reasonableness.**  As to the second part of the jurisdictional analysis, in deciding whether the exercise of personal jurisdiction would be reasonable, courts must examine "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Metro Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996).  The Court of Appeals has emphasized, however, that courts must analyze reasonableness in tandem with minimum contacts, because "depending on the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional

---

[1]   Because it may impact the temporal scope of jurisdictional discovery, the Court must address Defendants' argument that for purpose of analyzing personal jurisdiction, the Court may only consider Defendants' forum contacts as of June 11, 2018 -- the date Biofrontera filed its initial complaint.  (Def. Br. at 9.) Although Defendants are correct that courts must assess the defendant's forum contacts "at the time the lawsuit was filed," see, e.g., Kinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione, 937 F.2d 44 (2d Cir. 1991), none of their authority examines how that rule applies in situations where, like here, the plaintiff amends its complaint to include new allegations of misconduct. Defendants' view that the Court must disregard contacts created by that newly alleged conduct has no basis in the law and is rejected.

[2]   Biofrontera also argues that its claims call for a domestic application of the securities laws because they target conduct that "impacted domestic transactions" and "transactions

13

analysis may have a greater or lesser effect on the outcome of the due process inquiry." Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). As noted above, discovery is needed to clarify the extent of Defendants' contacts with the forum. The Court can only assess the reasonableness of asserting jurisdiction over Defendants after discovery brings their forum contacts into sharper focus. Defendants' motion to dismiss for lack of personal jurisdiction is therefore denied without prejudice to renewal following completion of jurisdictional discovery.

### b. Rule 12(b)(6) and 12(b)(1) Motions

#### i. Sections 14(e) and Rule 14e-5 Claims

Biofrontera asserts claims under Exchange Act § 14(e), "an antifraud provision specifically tailored to the field of tender offers," United States v. Chestman, 947 F.2d 551, 560 (2d Cir. 1991), and under SEC Rule 14e-5(a), 17 C.F.R. § 240.14e-5(a), which prohibits the tender offeror and related persons from buying securities outside the tender offer. Defendants argue that the § 14(e) and Rule 14e-5(a) claims fail under Rule 12(b)(6) because they seek an impermissible, extraterritorial application of federal law. The Court agrees with Defendants and dismisses those claims.

The presumption against extraterritoriality reflects "a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 255 (2010)

(citation and internal quotation marks omitted). "This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit on Congress's power to legislate" and "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters." Id. Accordingly, unless Congress "clearly express[es]" an "affirmative intention" for a statute to apply extraterritorially, courts "must presume it is concerned with domestic conditions." Id. (quoting EEOC v. Arabian AM. Oil Co., 499 U.S. 244, 248 (1991).

In Morrison, the Supreme Court ruled that Exchange Act § 10(b) does not apply extraterritorially and limited § 10(b)'s reach to two contexts: "transactions in securities listed on domestic exchanges and domestic transactions in other securities." 561 U.S. at 267. Biofrontera does not contend that § 14(e) or Rule 14e-5 applies extraterritorially -- instead, it argues that the Complaint calls for a permissible, domestic application of those provisions consistent with the two-pronged framework set forth in Morrison. (See Opp. at 16-18.) This argument does not withstand scrutiny.

As to the first Morrison prong -- transactions in domestically listed securities -- the claims here involve tender offers for Biofrontera's common stock, which trades on a German exchange, not a U.S. exchange. (See AC ¶ 22; Zours Decl. ¶ 10.) Although Biofrontera's ADSs trade on NASDAQ, the ADSs themselves could not be sold in connection with the 2018 or 2019 Tender Offers. Indeed, Biofrontera agrees that ADS holders could only participate in the

tender offers by converting their ADSs to ordinary shares and then selling those shares on the German exchange. (See Opp. at 17.) Just as the rules of English grammar do not properly apply to The Great Gatsby once translated into Der Große Gatsby, the U.S. securities laws do not govern transactions in German-listed shares merely because those shares source back to American-listed ADSs. As the Supreme Court has explained, "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States," Morrison, 561 U.S. at 266 (emphasis in original), and plaintiffs cannot establish a domestic application by "simply alleging that some domestic conduct occurred," Norex Petro. Ltd. v. Access Indus., Inc., 631 F.3d 29, 33 (2d Cir. 2010) (emphasis added); see also Liu Meng-Lin v. Siemens AG, 763 F.3d 175, 180 (2d Cir. 2014) (affirming dismissal on extraterritoriality grounds when the complaint failed to allege a "meaningful relationship" between the plaintiff's injury and the defendant's U.S.-listed securities). Given that Biofrontera's claims target tender offers for its stock, the fact that its ADSs trade on NASDAQ does not transform their claims into a domestic application of the securities laws.

Turning to the second Morrison prong, Biofrontera has not alleged claims involving "domestic transactions." See Morrison, 561 U.S. at 267. The Court of Appeals has explained that "domestic transactions" are "those involving securities in which (1) irrevocable liability is incurred in the United States, or (2)

title passes within the United States." <u>Giunta v. Dingman</u>, 893 F.3d 73, 79 (2d Cir. 2018) (citing <u>Absolute Activist Value Master Fund Ltd. v. Ficeto</u>, 677 F.3d 60, 62 (2d Cir. 2012)). Biofrontera contends this standard is met because "[a]ny investor who converted ADSs would have incurred irrevocable liability to effectuate that transaction in the U.S." (Opp. at 18.) Again, this misses the point. The gravamen of the Biofrontera's claims is tender offer transactions in Biofrontera stock, not its ADSs. That investors may have converted ADSs into Biofrontera shares in the United States says nothing about where they incurred irrevocable liability when they later tendered those shares to Defendants. Because Biofrontera has not plausibly alleged that the tender offer sales were domestic transactions, the § 14(e) and Rule 14e-5 claims seek an impermissible, extraterritorial application of the securities laws and are therefore dismissed.[2]

---

[2]  Biofrontera also argues that its claims call for a domestic application of the securities laws because they target conduct that "impacted domestic transactions" and "transactions involving the purchase and sale of securities listed on a domestic exchange." (Opp. at 17-18.) This argument fails. Biofrontera cites no authority that authorizes the application of U.S. law to conduct that merely "impacts" U.S. markets, and the Court is aware of none. Indeed, accepting Biofrontera's theory would burst the territorial wall <u>Morrison</u> erected around the U.S. securities laws and effectively resuscitate the "effects test" <u>Morrison</u> abrogated as a method for analyzing extraterritoriality issues. <u>See</u> 561 U.S. at 257-60 (rejecting the "effects test," which examined extraterritoriality by evaluating "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens" (quoting <u>SEC v. Berger</u>, 322 F.3d 187, 192-93 (2d Cir. 2003))).

ii. Section 13(d) Claim

Defendants do not move to dismiss the Exchange Act § 13(d) claim on extraterritoriality grounds. Instead, they argue that the claim (1) is moot, thereby divesting the Court of subject matter jurisdiction, see Doyle v. Midland Credit Mgmt., Inc., 722 F.3d 78, 80 (2d Cir. 2013), (2) gives no basis for injunctive relief, and (3) offends principles of international comity. Although the Court agrees that certain aspects of the § 13(d) claim are moot, the claim is not altogether defective and survives dismissal.

Congress passed § 13(d) of the Exchange Act in the late 1960s in response to a surge in hostile corporate takeovers. See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 286 F. 3d 613, 617 (2d Cir. 2002). "[T]he goal of § 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control." CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 654 F.3d 276, 286 (2d Cir. 2001) (quoting Treadway Cos., Inc. v. Care Corp., 638 F.2d 357, 380 (2d Cir. 1980)); See also Hallwood Realty, 286 F.3d at 617 (explaining that 13(d) requires disclosure "by persons who have acquired substantial interest, or increased their interest in the equity securities of a company by a substantial amount, within a relatively short period of time" (quoting H. R. Rep. No. 90-1711, at 8 (1968))).

As part of its alert system for potential changes in corporate control, § 13(d) forces investors who acquire over 5% of a

company's equity securities to file a Schedule 13D report disclosing information to the issuer, securities exchanges, and the SEC. See 15 U.S.C. § 78m(d). Investors subject to § 13(d)'s reporting requirement must file their Schedule 13D report within 10 days of acquiring the securities and must amend their disclosure "[i]f any material change occurs in the facts set forth in the statements." Id. §§ 78m(d)(1), (2). Issuers may bring a claim for injunctive relief under § 13(d) if a beneficial owner fails to file a Schedule 13D, see Hallwood Realty, 286 F.3d at 620, or if the Schedule 13D is false or misleading, United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991) ("A duty to file under § 13(d) creates the duty to file truthfully and completely.").

Biofrontera alleges that Defendants failed timely to file a Schedule 13D disclosure upon hitting § 13(d)'s reporting threshold and that their belated Schedule 13D filings were misleading. (See AC ¶¶ 69-70.) Specifically, Biofrontera claims that Defendants' 13D filings contained inaccuracies and omissions regarding, among other things, Defendants' solicitation and purchases of securities from U.S. investors, the applicability of the 2018 Tender Offer to holders of Biofrontera ADSs, and the 2019 Tender Offer's compliance with Rule 14d-1's "Tier I" exemption. (See, e.g., AC ¶¶ 54-56, 70; Opp. at 22-23.) Defendants respond that any § 13(d) deficiencies were cured by their initial and amended Schedule 13D filings and that their stated reliance on the Tier I exemption was accurate. (See Def. Br. at 17-18, 21-22; Reply at 12.)

The Court agrees that Defendants cured some of the alleged defects in their Schedule 13D filings, rendering a § 13(d) claim based on those defects moot. With respect to the 2019 Tender Offer, Defendants' first Schedule 13D filing stated that the offer would not be available in the United States. (AC ¶ 45.) Just days after that initial disclosure, however, Defendants filed a Schedule 13D amendment disclosing that they "expected" to make the 2019 Tender Offer to U.S. investors, and, in a later amendment, that the offer "[wa]s being made to U.S. shareholders." (Id.) These quick corrective disclosures remedied the problems in the earlier filing and preclude a finding of liability. See Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus., No. 09 Civ. 8262 (PGG), 2010 WL 2835548, at *10 (S.D.N.Y. July 13, 2010) ("In the context of Section 13D filings, [it] has been stated as the general rule that once a subsequent 13D filing cures alleged omissions in a prior filing, the § 13(d) claim alleging omissions must be dismissed as moot." (citation and internal quotation marks omitted)).

Biofrontera's § 13(d) claim is not subject to outright dismissal, however, as the Complaint alleges some Schedule 13D inaccuracies that were not fixed by timely corrective disclosures. Most significantly, the Schedule 13(d) filings for the 2018 Tender Offer stated that the offer was not directed at or available to U.S. investors, which was inaccurate given that Defendants were allegedly soliciting at least one U.S. investor to sell shares into the offer. (See Indych Decl. Ex. A at 13; AC ¶ 12.) The 2018

Tender Offer closed in August 2018, but Defendants never corrected their prior, inaccurate representations about staying away from U.S. investors. (Indych Decl. Ex. A at 13.) That is sufficient to state a claim for a violation of § 13(d). See Hallwood Realty Partners, L.P. v. Gotham Partners L.P., 95 F. Supp. 2d 169, 178-79 (S.D.N.Y. 2000) (sustaining § 13(d) claim based on defendant's failure to report accurately their corporate ownership stake).

With respect to Defendants' statements about relying on the Tier I exemption for the 2019 Tender Offer, the Court finds that Biofrontera has not plausibly alleged § 13(d) liability. Biofrontera argues that despite Defendants' representations to the contrary, Defendants did not in fact qualify for the Tier I exemption because they violated Rule 14d-1, which, among other things, requires tender offerors seeking Tier I treatment to "furnish" "informational documents" regarding the offer on Form CB "by the first business day after publication or dissemination" of the tender offer in the offeror's home jurisdiction. See 17 C.F.R. § 240.14d-1(c)(3)(iii). Biofrontera argues that Defendants announced the 2019 Tender Offer in a disclosure on May 29, 2019 but did not furnish that document on Form CB until almost a month later, and that their untimely filing Form CB disqualified them from relying on Rule 14d-1's Tier I exemption. (AC ¶ 45-49.)

Biofrontera's argument is unavailing. The document released on May 29 was not an offer at all -- it was an announcement that DB Biotech was submitting a proposed offer to German regulators for

their review and that following regulatory approval, DB Biotech would publish the offer to Biofrontera's shareholders. (<u>See</u> Schwartzkopff Decl. Ex. A.)  The announcement was silent on virtually all the proposed offer's material details, including its pricing, and expressly stated that it was "neither an offer to purchase nor a solicitation of an offer to sell Biofrontera AG shares" and that the offer's "final provisions" would only be announced in a formal offer document following regulatory approval. (<u>Id.</u>)  On June 21, 2019, the German regulators approved the proposed tender offer, and on the following business day -- as Rule 14d-1 required -- DB Biotech and Delphi filed their Form CB with the SEC.  (<u>See</u> AC ¶ 48; Indych Decl. Ex. F.)  There is thus no basis to Biofrontera's claim that Defendants filed Form CB late and that, contrary to their Schedule 13D disclosure, they did not actually qualify for the Tier I exemption.

As an additional basis for dismissal, Defendants contend that Biofrontera's request for injunctive relief on the § 13(d) claim is deficient.  The Complaint seeks an order (1) requiring Defendants immediately to file a complete and accurate amended Schedule 13D report correcting their prior misrepresentations and (2) enjoining Defendants from voting their shares, acquiring additional shares, or influencing control of Biofrontera until six months after they file an amended Schedule 13(d).  (AC ¶ 71.)  Defendants argue that an injunction is unwarranted here because Biofrontera has not shown irreparable harm or a probability of further violations.  (Def. Br.

at 22-23.) Although the Court doubts that Biofrontera will ultimately establish its entitlement to its second category of requested relief, it would be premature for the Court to resolve that issue at this early stage in the case. See Hallwood Realty, 95 F. Supp. 2d at 179 (declining to strike parts of plaintiff's prayer for relief under § 13(d) at the motion to dismiss stage).

Lastly, Defendants argue that the Court should dismiss the § 13(d) claim for international comity reasons, leaving this dispute to Germany's judicial system for resolution. The Court declines that invitation. Comity counsels that U.S. courts may abstain from hearing a case when, among other things, the parties are litigating a "parallel" case elsewhere involving "substantially the same issues in both actions." Freund v. Republic of France, 592 F. Supp. 2d 540, 575 (2d Cir. 2008) (quoting Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 94 (2d Cir. 2006)). That does not appear to be the situation here. Defendants note that the parties are currently litigating actions in Germany involving "the corporate conduct and governance of Biofrontera, the actions of Biofrontera's management . . . and issues of corporate control." (Def. Br. at 7.) Although those German actions may be related to this lawsuit, nothing suggests that they address the questions presented here about whether Defendants violated U.S. securities laws in making their Schedule 13D filings. (See Def. Br. at 7-8.) Accordingly, the Court declines to dismiss the § 13(d) claim on the basis of comity.

iii. <u>Section 20(a) Claim</u>

Biofrontera asserts a control person claim under Exchange Act § 20(a) against Mr. Zours for Deutsche Balaton's alleged violations of §§ 13 and 14. (AC ¶¶ 86-90.) "To establish a prima facie case of control liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 108 (2d Cir. 2007). Biofrontera has not met that standard. With respect to the § 14 claim, Biofrontera's failure to plead a primary violation is fatal to the corresponding § 20(a) claim. As to the § 13(d) claim, Biofrontera has alleged a primary violation but not any culpable participation by Mr. Zours. The § 20 claim is therefore dismissed.

**c. Non-Federal Claims**

Alongside its federal securities claims, Biofrontera asserts common law claims for libel, trade libel, and tortious interference with prospective business opportunity, invoking 28 U.S.C. § 1367 as the basis for the Court's subject matter jurisdiction. (AC ¶¶ 17, 58-57.) The parties disagree as to what law controls these claims, with Biofrontera arguing for New York law and Defendants for German law. (<u>See</u> Def. Br. at 24 & n.6; Opp. at 24-25; Reply at 14-15.)

"In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." <u>Manning</u>

Int'l Inc. v. Home Shopping Network, Inc., 152 F. Supp. 2d 432, 436 n.3 (S.D.N.Y. 2001) (citing Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989)). New York applies an "interest analysis" to resolve choice-of-law issues, giving "controlling effect to the law of the jurisdiction[] which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 337 (2d Cir. 2005) (quoting Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 595 (1993)).

Applying an interest analysis, the Court finds that German law governs Biofrontera's non-federal claims. All the parties in this case are German, and the allegedly libelous and defamatory statements were published on a German website and primarily relate to Defendants' efforts to increase their shareholdings in a German company. On the other hand, the only contacts with New York are that part of Biofrontera's U.S. roadshow occurred here and that the second allegedly defamatory letter was addressed to a Biofrontera board member who lives in New York. (Opp. at 24-25.) These contacts are comparatively negligible and do not justify applying New York, rather than German, law to the non-federal claims.

While German law governs, the Court cannot conclude on this record whether Biofrontera adequately pleaded its non-federal claims under German law. Federal Rule of Civil Procedure 44.1 provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony." Fed. R.

Civ. P. 44.1.  Here, Defendants submitted a few German cases and statutes concerning legal principles applicable to libel claims, and Biofrontera filed an affidavit from a German capital markets lawyer containing a single paragraph on purportedly relevant issues.  (Indych Decl. Exs. J-N; Schwartzkopff Decl. ¶¶ 1, 8.) Defendants devote about three pages of their brief to German law arguments; Biofrontera dedicates less than half a page.  (Def. Br. at 24-27; Opp. at 27.)  On the papers before it, the Court cannot determine what Biofrontera must allege under German law to state claims for libel, trade libel, or tortious interference with prospective business opportunity, which makes it impossible to evaluate whether Biofrontera has met its pleading burden.  The Court will therefore defer ruling on Defendants' motion to dismiss the non-federal claims pending supplemental briefing from the parties on those claims' adequacy under German law.  See Kashef v. BNP Paribas SA, No 16 Civ. 3228 (AJN), 2020 WL 1047573, at *9-10 (Mar. 3, 2020) (ordering supplemental briefing when the parties' filings left the court "in [no] position to determine whether [plaintiffs] stated a claim under Swiss law").

IV.  **CONCLUSION**

To the extent they are not addressed above, the Court has considered the parties' other arguments and finds them unavailing. For the foregoing reasons, Defendants' motion to dismiss the Complaint [dkt. no. 48] is GRANTED as to Biofrontera's claims under § 14(e), Rule 14e-5, and § 20(a) and otherwise DENIED.  The parties are directed to propose a schedule for jurisdictional discovery and for supplemental briefing on the German law issues by letter no later than April 17, 2020.  Counsel shall arrange a conference call dial-in for a telephonic conference with the Court on April 24, 2020 at 10:00 a.m. to discuss the status of the action, settlement, etc.  The Clerk of the Court is directed to close the open motion.

**SO ORDERED.**

Dated:      March 27, 2020
            New York, New York

_____
LORETTA A. PRESKA
SENIOR U.S. DISTRICT JUDGE